# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

CARL EDWARD CORWIN,

Claimant,

vs.

ANDREW M. SAUL,
Commissioner of Social Security,

Defendant.

No. 20-CV-2003-LTS

**REPORT AND
RECOMMENDATION**

---

Carl Edward Corwin ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that he was not disabled. For the reasons that follow, I recommend that the Commissioner's decision be **affirmed**.

## I.      BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 11) and only summarize the pertinent facts here. Claimant was born September 22, 1969. (AR[1] at 173.) Claimant has at least a high school education and is able to communicate in English. (*Id.* at 21.) He allegedly became disabled due to major depression. (*Id.* at 206.) Claimant's onset of disability date was September 15, 2016. (*Id.* at 173.) Claimant

---

[1] "AR" cites refer to pages in the Administrative Record.

Case 6:20-cv-02003-LTS-MAR    Document 16    Filed 03/08/21    Page 1 of 43

filed an application for SSI on March 31, 2017. (*Id.* at 10.) His claim was denied originally and on reconsideration. (*Id.* at 90-94, 98-102.) A video hearing was held on April 22, 2019, with Claimant and his attorney, Hugh Field, in Waterloo, Iowa and ALJ Robert A. Kelly presiding from a remote location.[2] (*Id.* at 30-55.) Vocational expert ("VE") Randall Harding appeared by telephone. (*Id.* at 30.) Claimant and the VE testified. (*Id.* at 33-54.) The ALJ issued an unfavorable decision on May 10, 2019. (*Id.* at 10-22.)

Claimant requested review and the Appeals Council denied review on November 18, 2019. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On January 22, 2020, Claimant timely filed his complaint in this Court. (Doc. 4.) On August 25, 2020, briefing deadlines expired and the Honorable Leonard T. Strand referred the case to me for a Report and Recommendation.

## II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

_____

[2] The transcript of the hearing says that ALJ Kelly was in Kansas City, Missouri. (AR at 30.) Judge Kelly's decision says that he presided from West Des Moines, Iowa. (*Id.* at 10.)

2

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors.  20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations.  *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).  At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy.  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity."  *Id.*  If so, the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation."  *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe.  20 C.F.R. § 416.920(a)(4)(ii).  If the impairments are not severe, then the claimant is not disabled.  *Id.*  An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities."  *Id.* § 416.920(c).  The ability to do basic work activities means the ability and aptitude necessary to perform most jobs.  *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)).  These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple

3

instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to this application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's

4

RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.    *The ALJ'S Findings*

The ALJ made the following findings regarding Claimant's disability status at each step of the five-step process. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his application date of March 31, 2017.    (AR at 12.) Although Claimant had been working 20 hours a week since the beginning of 2019 as a janitor, the ALJ found the claimant had not earned substantial gainful activity income since his alleged onset of disability date. (*Id.*)

At step two, the ALJ found that Claimant suffered from the following severe impairments: depression, mild lumbar degenerative disc disease, lumbar radiculopathy, and obesity. (*Id.*)    The ALJ found Claimant's essential tremor, celiac disease, osteoarthritis of the right knee, vision loss in the right eye from birth, trochanteric bursitis, and gastric ulcer to be nonsevere impairments. (*Id.*)  In addition, the ALJ found Claimant's alleged fibromyalgia was not a medically determinable impairment. (*Id.* at 13.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.*)

The ALJ evaluated Claimant's claims under listings 1.02 (major dysfunction of a joint(s)); 1.04 (disorders of the spine); and 12.04 (depressive, bipolar and related disorders). (*Id.* at 14-15.)  The ALJ also considered the effects of Claimant's "extreme obesity" when crafting the RFC and reduced the RFC to light work in recognition of Claimant's obesity. (*Id.* at 19.)

At step four, the ALJ found that Claimant had the following RFC:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except the claimant cannot climb ladders, ropes, or scaffolds; can only occasionally crawl, kneel, crouch, or stoop; can only occasionally interact with co-workers and the general public; and can frequently, but not constantly, handle and finger; is limited to simple, unskilled work tasks with no more than occasional simple work-related decisions, problem solving, and use of independent judgment; due to a moderate limitation in the ability to maintain focus, attention, and concentration, the claimant may be off-task for up to five percent of the workday; and, cannot perform work that is defined by the *DOT* or the *SCO* as high-stress work, such as first-responder work (*e.g.,* police officer, fire fighter, or ambulance driver). The claimant can tolerate only occasional changes in the work setting or work tasks.

(*Id.* at 15.) The ALJ also found that Claimant was unable to perform any of his past relevant work. (*Id.* at 21.) At step five, the ALJ found there were jobs that existed in significant numbers in the national economy Claimant could perform, including cleaner I (housekeeping), routing clerk, and garment sorter. (*Id.* at 22, 53.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). Thus, a court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing

*Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to provide good reasons for finding he was not credibly reporting his limitations; (B) failing to provide good reasons for the weight afforded to "the probable other source opinion" from Resource for Human Development and failing to remand for further development of this opinion; and (C) failing to fully and fairly develop the record for several reasons.

**A.**   ***Whether the ALJ Provided Good Reasons for Challenging Claimant's Credibility***

   ***1.    Relevant Facts***

As the ALJ noted, Claimant's "main allegations for disability pertain to his mental health." (AR at 16.) The parties have differing positions regarding the relevance of the two-month period from early April 2018 through early June 2018 during which Claimant was hospitalized multiple times for suicide attempts. The parties both encourage the Court to analyze Claimant's mental health history in context. Thus, an overview of Claimant's mental health before and after 2018 is necessary. Emphasis will be put on

the time in and around spring 2018 because Claimant takes issue with the ALJ's failure to put statements he made during that time in context. The following chronology of facts is gleaned from evidence cited in the parties' briefs and my reading of the administrative record.

### a. Claimant's Mental Health Prior to Spring 2018

On September 26, 2016, Claimant presented to Covenant Medical Center's ("Covenant") emergency department ("E.D.") for "suicidal ideation without plan." (AR at 284.) At that time, Claimant was the primary caregiver for his mother who had dementia. (*Id.*) On September 27, 2016, during his stay at Covenant, Claimant reported to Dr. Sunita Kantamneni that he was "anxious, depressed, and . . . not handling himself very well." (*Id.* at 263.) He reported that although he had a long history of anxiety and depression, he had never received treatment for the conditions. (*Id.*) Claimant was cooperative, provided appropriate answers to questions, had a depressed mood and affect, and his thought processes were logical and goal oriented. (*Id.*) He had no suicidal thoughts. (*Id.*) Claimant was discharged on September 29, 2016. (*Id.* at 262.) By December 2016, Claimant's mother had apparently been placed in a memory care facility (*Id.* at 42) and Claimant was living in a Salvation Army shelter. (*Id.* at 327). Dr. Penumetsa B. Raju noted Claimant was doing well on his medications, had a normal mental status examination, and was diagnosed with major depression, recurrent, mild. (*Id.*) Because Claimant had some sleep disturbance, Dr. Raju increased Trazadone. (*Id.*)

For the next sixteen months, Claimant had generally normal mental status examinations with intact judgment and insight, normal mood and affect, and no depression, anxiety, or agitation, sometimes even denying that he felt anxious or depressed. (*Id.* at 269-70, 333, 336, 574, 582, 598.) Even when Claimant reported to Dr. Raju in March 2017 that he was not doing well, there was an underlying cause. Claimant's Tramadol prescription was discontinued and he reported chronic pain. (*Id.*)

Claimant was also unhappy because he was not used to living alone in an apartment and thought he needed "people contact [and] felt quite isolated and alone." (*Id.* at 328.) At that time, Dr. Raju noted not only Claimant's anxious, depressed, and somewhat distraught and dysphoric mood, but also his coherent, relevant, and goal-directed thoughts, good memory and attention, and that he denied thoughts of self-harm. (*Id.*)

In January 2018, Claimant reported that he had lost his insurance and had been without his medications for six months, that he was back on his medication, and his mood was slowly improving. (*Id.* at 706.) Claimant said, "I have a tendency to not be honest about my symptoms. I want to start fresh and be honest now." (*Id.*) In March 2018, Claimant's mental status examination revealed suicidal thoughts/ideations, problems remembering dates and years, and an angry/anxious/dysphoric/helpless/hopeless mood and affect. (*Id.* at 712.) The examiner noted Claimant had normal thought processes and judgment and insights, and changed Claimant's medications. (*Id.* at 714.)

### b. Claimant's Mental Health in Spring 2018

On April 4, 2018, Claimant voluntarily admitted himself to Covenant, reporting that he had been evicted from his apartment at the end of March because his housing funding ran out, he was currently homeless, unemployed, overwhelmed, and had been having suicidal thoughts for two days. (*Id.* at 669.) He decided to sit on a bench and freeze to death, but could not bear the cold after a couple of hours, so went to the hospital instead. (*Id.*) At the time of his intake, Dr. Kantamneni noted Claimant was cooperative and answered questions appropriately, had an anxious mood and congruent affect, grossly logical and goal-oriented thought processes, and fair judgment and insight. (*Id.*) He was diagnosed with major depression, recurrent, severe without psychotic symptoms and anxiety disorder, not otherwise specified. (*Id.* at 670.) Dr. Kantamneni continued Claimant on his current medications, added lorazepam, and estimated his stay at Covenant would be two-to-three days. (*Id.*) Once Claimant was admitted, "he became angry and

9

wanted to be discharged and [Covenant] obtained a 48-hour hold on him." (*Id.* at 671.) After [Claimant] was started on lorazepam, he was able to calm down." (*Id.*) Claimant denied having any suicidal thoughts and was discharged on April 5, 2018. (*Id.*)

Two days later, on April 7, 2018, Claimant presented to Unity Point Health ("Unity" or "Allen") E.D. "with lacerations to wrists bilaterally" and was interviewed on April 8. (*Id.* at 372, 376.) "[Claimant stated he had] been feeling suicidal for '20 years.' States 'there is just no hope and I don't want to live anymore.'" (*Id.* at 372.) Claimant required stitches for his lacerations. (*Id.* at 373.) He became angry when staff tried to interview him, walked out of the room, and stated he would not speak to anyone until they initiated a 48-hour involuntary hold. (*Id.*) Claimant thought the staff treated him unprofessionally: "I am crazy, but I am not a child." (*Id.*)

After Claimant calmed down, he reported he was discharged from Covenant a few days ago "because I can be a good actor," and he did not want to deal with the doctor at Covenant. (*Id.*) Claimant reported that he worries all the time and his condition worsened after he lost his subsidized housing. (*Id.*) He was diagnosed with major depression, recurrent, severe, without psychosis; generalized anxiety disorder; and Cluster B personality traits. (*Id.* at 375.) Claimant was discharged on April 11, 2018. (*Id.* at 376.)

> Patient was seen on the day before discharge, presented cooperative, in good spirits, was hesitant about having [suicidal ideations] or not. We discussed his treatment plan, patient agreed that he needed help and was ready to work on further assistance for his needs out of the hospital. No commitment for involuntary treatment was initiated because of that. On the day of discharge, Mr. Corwin was angry at not being discharged immediately once the involuntary hold had expired. The patient was seen together with other members of the treatment team, and the director of mental health services. Patient was advised that he may be held for 24 hours after involuntary hold expires, for further considerations. The treatment team recommended patient to stay to continue treatment and provided with more resources for psychosocial assistance post discharge.

10

> Patient stated he was not suicidal, stated that he would not benefit from staying in the hospital. . . . After the treatment team discussion, patient was discharged AGAINST MEDICAL ADVICE.

(*Id.* at 376-77 (emphasis in original).) Claimant's mental status examination noted he was uncooperative, irritable, and had limited insight and judgment. (*Id.* at 377.)

On April 13, 2018, Claimant's mental status examination revealed intact judgment, insight, and memory, and no depression, anxiety, or agitation. (*Id.* at 560.)

On May 23, 2018, Claimant was found lying on the ground with two empty pill bottles nearby. (*Id.* at 379.) Claimant was brought to Unity E.D. where he was conscious enough to tell staff he had overdosed on Tramadol and Ativan in an attempt to commit suicide. (*Id.* at 379, 383.) Claimant was still drowsy when he saw a psychiatrist on May 26 who diagnosed severe major depression with melancholic features. (*Id.* at 385.) Claimant was discharged on June 1, 2018, and stated that he "always has suicidal ideations in the back of his mind but denied any intent or plan during his hospital stay." (*Id.* at 396.) Claimant "stated that he was better off during this hospitalization because he had more supports, established outpatient services and a place to stay. He related that his major trigger for depression was chronic pain." (*Id.*) Upon discharge, Claimant had a normal mental status examination. (*Id.*)

On June 2, 2018, Claimant again presented to Covenant for suicidal ideation with no particular plan. (*Id.* at 654.) Claimant wanted pain medication. (*Id.*) He was diagnosed with major depressive disorder, severe, without psychotic symptoms and general anxiety disorder. (*Id.* at 655.) Claimant was discharged from Covenant on June 4, 2018. (*Id.* at 656.) During his stay, his dosages of lithium and Wellbutrin were increased. (*Id.*) Claimant's discharge summary states the following:

> During his hospital stay, the patient was very manipulative and gamey. He wanted to stay in the hospital for a very long time. He acknowledged that he has some issues with his roommate and does not want to go back home.

After a long discussion, the patient was willing to go to a homeless shelter for some time.

(*Id.*)

Claimant presented back to Covenant on June 6, 2018 for thoughts of committing suicide by overdose. (*Id.* at 650.) He was homeless and wanted a long-term placement. (*Id.*) Dr. Kantamneni diagnosed him with major depression, recurrent, severe without psychotic symptoms; generalized anxiety disorder and malingering. (*Id.*) Claimant was admitted for a one-to-two-day stay. (*Id.*) Upon discharge on June 7, Dr. Kantamneni noted that Claimant came to the psychiatry unit via the E.R., where his family had dropped him off a couple of hours after his last discharge on June 4 and Claimant waited for almost two days before deciding to go to the psychiatry unit. (*Id.* at 652.) Dr. Kantamneni stated,

> The patient initially was expecting to stay in the hospital a very long time, once he realize[d] that we were short-term facility, he was a little disappointed, but was willing to go home on his own without any assistance today. At the time of discharge, patient denied any current thoughts of hurting himself or others.

(*Id.*)

On June 27, 2018, Claimant told Donna Dobson Tobin at Black-Hawk Grundy Mental Health Center that he did not feel he was ready to go when he was released from the Unity/Allen "so went to Covenant and was hospitalized. Had to leave there due to being told that his inpatient days with Insurance were done. Ended up having another hospitalization at Covenant awaiting a bed somewhere else which there was never one so was released after 3 days." (*Id.* at 725.) Claimant reported better mood on his current medications and no suicidal thoughts. (*Id.*) Except for an anxious affect, his mood and affect were normal and improved and the rest of his mental status examination were normal. (*Id.*) Claimant also reported that he is able to calm himself when he is anxious. (*Id.*)

12

### c.    Claimant's Mental Health Post-Spring 2018

Claimant was never hospitalized again for mental health issues from June 8, 2018 through the end of the relevant time period.    During that time, his mental status examinations and functioning were generally normal and Claimant denied depression, anxiety, and suicidal ideation when asked.  (*E.g. id.* at 413; 427; 432; 457; 466; 492; 510; 512; 518; 521 (Claimant called his general health "good" in January 2019); 523-24 (in November 2018, Claimant was living in an apartment and was excited to vote and watch election returns); 525; 633 (neurologist stated "reasonably alert and oriented for . . . age and situation without obvious depression or anxiety" in March 2019).) An exception was when Claimant experienced situational stress due to losing housing again in August 2018, but even then, Claimant was handling the situation better than in the past.  (*Id.* at 729-30 (Claimant was angry about living in a shelter again, but was motivated to get a job and find subsidized housing; suicidal thoughts "'pop up' at times but they are not all of the time like they have been in the past when he has had to deal with similar stressors. He does not see suicide as an option this time.").)

### 2.    Relevant Law

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms.  *Id.* § 404.1529(b),(c).  When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski*

13

factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[3] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[s] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id*. § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

   3.   *Analysis*

      a.   *Statements Arguably Taken Out of Context*

The main focus of Claimant's arguments is that the ALJ took statements Claimant made during his treatment for suicide attempts out of context and put them in the worst light in the decision. Claimant asserts that once his comments are viewed in context, it is obvious that he was actually suicidal throughout the relevant time period.

---

[3] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v),(vi).

The Commissioner responds that Claimant's view of context in this situation is merely his interpretation of the evidence. (Doc. 13 at 5.) The Commissioner argues that the ALJ put Claimant's unflattering statements in context, noted that Claimant reported better mental functioning when he was compliant with his prescribed medication, and properly observed inconsistencies between Claimant's reported symptoms and the record. (*Id.* at 6-17.)

First, I note that the Commissioner started his mental impairment analysis by acknowledging Claimant's "several hospitalizations for suicidal ideation and attempts." (AR at 16 (noting that some of the hospitalizations were voluntary and some were involuntary).)

Second, the Commissioner's argument that Claimant's mental functioning was better when he was compliant with his medication is supported by the record. As the ALJ noted, "When the claimant was compliant with prescribed treatment, he often reported feeling better mentally. The record indicates he was often inconsistent with following recommended therapy and counselling treatments." (AR 17 (citing AR 327-28, 416, 516, 537, 646, 681, 725, 732) (internal citations incorporated into one citation).) "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (quoting *Roth v. Shalala,* 45 F.3d 279, 282 (8th Cir. 1995)).

Moreover, the record is clear that Claimant enjoyed relatively stable mental health prior to spring 2018 and that once Claimant was stabilized on his medications, his mental status was consistently normal and he did not have active suicidal ideations. An impairment that is controlled with treatment or medication is not considered disabling. *Brace v. Astrue*, 578 F.3d. 882, 885 (8th Cir. 2009) (citations omitted). The situational stress of homelessness and roommate issues appears to have been a consistent contributing factor to Claimant's 2018 suicide attempts, something he recognized in August 2018,

when he was healthy enough to face the issues and make a plan that did not involve suicide. (AR at 729.) Situational stressors cannot provide the basis for a disability finding. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010); *Dunahoo v. Apfel*, 241 F.3d 1033, 1040 (8th Cir. 2001).

Third, the pages cited by the ALJ in his decision and pages cited in the Relevant Facts section, above, support the ALJ's decision in which he cited heavily to the administrative record. The ALJ stated the following:

> The claimant has had several hospitalizations for suicidal ideation and attempts. Some of the hospitalizations were voluntary admissions and others were not, or were the result of him demanding to be placed on involuntary hold. He was typically calm and cooperative at discharge with improved symptoms.

> Otherwise, mental status examinations were often normal. He occasionally presented as anxious or depressed. However, more frequently, he was described as cooperative, calm, and bright with normal mood and affect. At times he even denied any depression or anxiety. His appearance was often appropriately groomed and dressed. His speech was typically normal, with logical and goal oriented thought processes, and fair insight and judgment. Finally, his memory and attention span were typically good and his concentration was usually normal.

(*Id.* at 16-17 (citations omitted).) Thus, substantial evidence on the record as a whole supports those findings of the ALJ. The ALJ continued:

> Additionally, the evidence indicates the claimant's reported symptoms or impairments were not always an accurate reflection of his symptoms and some of his reported issues were inconsistent with the record as a whole. One provider noted "He reports that he was discharged from Covenant Hospital a few days ago 'because I can be a good actor' and he did not trust/ did not want to deal with the doctor over there." Another stated "during his hospital stay, the patient was very manipulative and gamey. He wanted to stay in the hospital for a very long time . . ." due to issues with his roommate. At another point in the medical records, the claimant told a health-care provider, "I have a tendency to not be honest about my

16

symptoms." Thus, the claimant's allegations, averments and testimony are found less persuasive than might otherwise be the case if his veracity was not in question.

(*Id.* at 17.)

Claimant first takes issue with the ALJ's citation to his statement, "I have a tendency to not be honest about my symptoms." (Doc. 12 at 4.) The full statement to which the ALJ referred was, "I have a tendency to not be honest about my symptoms. I want to start fresh and be honest now." (*Id.* at 706.) Claimant asserts that in context, it is obvious that Claimant was stating that he had not been honest in the *past*, but that as of January 2018, he intended to be honest with his healthcare providers about his suicidal thoughts. (*Id.*) Claimant argues that a review of Dr. Raju's notes shows that he did not report suicidal thoughts to her in the past, which makes it obvious that in January 2018, that is what he meant he wanted to be honest about. (Doc. 12 at 4.)

I find that even if the Court adopts Claimant's interpretation of this statement, and it arguably fits in context, it would not change the ALJ's decision. All this proves is that Claimant had suicidal thoughts in November 2016 and March and May 2017. (AR at 326-31.) Setting aside Claimant's claimed-false reports regarding his mental health during these visits, Dr. Raju's own assessments showed Claimant had a normal mental status examination with a bright mood in November 2016, and that he was experiencing situational stressors in March 2017 due to living alone and feeling unhappy and isolated because he felt he needed "people contact." (*Id.* at 328.) Dr. Raju documented Claimant's anxious, depressed, and somewhat distraught and dysphoric mood, but also his coherent, relevant, and goal-directed thoughts, good memory and attention. (*Id.*) In May, Claimant was volunteering at the homeless shelter, which Dr. Raju complimented, he had gone off his Trazadone on his own because it made him groggy and Dr. Raju changed Claimant's medications. (*Id.* at 330.) In spite of his depressed mood and

congruent affect, Claimant's thought process was coherent, relevant and goal directed. (*Id.* at 331.)  His associations were intact, and orientation and memory were good.  (*Id.*)  His diagnosis was major depression, recurrent, mild.  (*Id.*) Thus, even when Claimant was at his lowest point in the pages he cited, Dr. Raju's independent mental status examination did not note anything alarming.  Moreover, Claimant's lowest point could, arguably, have been precipitated by his failure to comply with his medication orders because he quit taking Tramadol before talking to Dr. Raju about the safe way to wean himself off the medication.  Finally, the ALJ recognized Claimant's depression as a severe impairment.  (*Id.* at 12.)  However, a severe impairment does not necessarily equate to a disability.  *See Guilliams*, 393 F.3d at 801 (RFC is what the claimant can still do despite his limitations).

Claimant next takes issue with the ALJ's citation to his statement that he was "very manipulative and gamey." (Doc. 12 at 8.)  He argues that in context it is obvious that Claimant had to work with insurance limits regarding his various hospital stays.  (*Id.* at 9 (citing AR 724).)  However, the two facts are not mutually exclusive.  Claimant could be subject to insurance limitations and still try to "game" the system to get out of an unpleasant roommate situation.  (AR at 656.)  The ALJ merely reported facts in the record.  I do not find that the "missing context"  necessitates reversal of the ALJ's conclusions.

Claimant last asserts that his statement, "He reports that he was discharged from Covenant Hospital a few days ago 'because I can be a good actor' and he did not trust/ did not want to deal with the doctor over there," represents a time when he "apparently told providers at Covenant Hospital he was not having thoughts of harming himself in order to be discharged while otherwise having difficulties with those providers, when he actually was having thoughts of harming himself." (Doc. 12 at 5.)  Whatever Claimant's motivations, this statement, and the fact that Claimant earned himself a discharge,

supports the ALJ's decision: "[C]laimant's reported symptoms or impairments were not always an accurate reflection of his symptoms." (AR at 17.) No healthcare professional has ever diagnosed Claimant as being delusional. That he had been manipulative and dishonest for various reasons during the relevant time period was not something the ALJ could ignore. I decline to speculate as to the reason why Claimant "acted" his way out of the hospital in April 2018. *See Vester*, 416 F.3d at 889 (the court does not reweigh the evidence). Suffice it to say Claimant admitted he did so. The ALJ was entitled to take into consideration evidence of Claimant's possible dishonesty with healthcare providers when reaching his decision. *See Lawson v. Colvin*, 807 F.3d 962, 966 (8th Cir. 2015)(ALJ entitled to draw conclusions about claimant's credibility based on psychiatrist's observation that she was exaggerating symptoms); *Jones v. Astrue*, 619 F.3d 963, 972-73 (8th Cir. 2010) (ALJ entitled to draw conclusions about claimant's credibility based on physician's noted dramatic and possibly contrived anxiety). Importantly, the ALJ did not completely disregard Claimant's subjective complaints based on this evidence. He merely found it "less persuasive than might otherwise be the case if his veracity was not in question." (AR at 17.)

### b.    *"Ignored" Evidence*

Claimant proffers two documents in the administrative record that he apparently asserts the ALJ should have cited. (Doc. 12 at 9-10.) The first is an August 31, 2018 behavior treatment plan from Resources for Human Development ("RDH"). (AR at 415-25.) Claimant notes that the goal of the plan was for Claimant to "understand basic residential skills, including housecleaning and social skills to obtain his own residence." (Doc. 12 at 9 (citing AR at 420).) Claimant argues,

> The goal was not for Mr. Corwin to find fulltime competitive employment, but instead it was, with RHD staff assistance, to find "parttime employment that fits his needs." (TR 423). This is consistent with Mr. Corwin's hearing testimony where Mr. Corwin explained he had "RHD, Resources for

Human Development" have a social worker assist him twice a week with his medication and keeping his house in order. (TR 37).

(*Id.*)

To the extent Claimant takes issue with the ALJ's failure to mention this treatment plan, that argument is without merit. The ALJ was not required to cite every piece of evidence in the record. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)), (an ALJ is not required to discuss every piece of evidence submitted). Importantly, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (bracket in original). Furthermore, to the extent Claimant argues that this treatment plan indicates that RDH staff thought Claimant *only* capable of acquiring basic life residential skills, that argument, too is without merit. RDH's mandate is to "promote[] recovery and independence for people with mental health challenges, helping people build life skills and self-confidence and removing as many barriers to independent living as possible." Resources for Human Development, *RDH Iowa*, https://www.rhd.org/iowa/. If Claimant is arguing that having a social worker assist him with his medications and housework somehow indicates he is unable to work fulltime, that argument, too is unpersuasive. Many people who work fulltime need help around the house and medication reminders. Moreover, any opinion about whether Claimant is employable is reserved for the Commissioner. The determination of whether a claimant is disabled is a decision reserved for the Commissioner and must be based on substantial evidence in the record. *Despain v. Berryhill*, 926 F.3d 1024, 1027 (8th Cir. 2019) (whether a claimant is disabled or unable to work are "issues reserved to the Commissioner") (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010)).

The second set of documents are Patient Health Questionnaire-9 ("PHQ-9") scores Claimant asserts "confirm[] that [he] had severe depression when formally tested." (Doc.

20

12 at 9 (citing AR at 571, 563, 530).) First, to call these scores "formal testing" is a stretch. These are health questionnaires that Claimant completed at appointments with Dr. Carl E. Corwin, who appears to be a general practitioner. Second, this information adds nothing new to the weight of the evidence. As discussed, the ALJ found Claimant's depression to be a severe impairment and limited the RFC because of Claimant's mental impairments. Third, the ALJ was not required to discuss every piece of evidence in the record. *See Wildman*, 596 F.3d at 966.

### c. Daily Activities

The ALJ stated the following:

> Finally, despite the claimant's impairments, he has been able to maintain a fairly active lifestyle. He was able to provide home care services for his mother who had dementia for a while, at least into 2016. (Exhibit lF). He is able to sit and read or use a computer all day at the library. (Exhibit lF/55). For a while, he volunteered at a homeless shelter. (Exhibits 3F/1; 3E). He reported watching television and following politics/election results. (Exhibits10F/22; 3E). He can vacuum, cook, prepare simple meals, use public transportation, and work part time. (Exhibits 10F/41; 11F/2; 3E; Hearing Testimony).

(AR at 19.)

Claimant asserts that the stress of providing care for his mother led to his estrangement from his family and his homelessness. (Doc. 12 at 10.) He also argues that the ALJ is faulting him for being homeless because when he lived in the shelter, he had to leave during the day, and sometimes he would spend his time at the library reading or using a computer. (*Id.* citing AR at 316).) Claimant also argues that the ALJ is maligning him for volunteering at the homeless shelter when it is not clear whether volunteering was a requirement for staying at the shelter. (*Id.* at 10-11 (citing AR at 213, 216-17, 230).) Claimant further avers that the general household tasks listed are not inconsistent with his reported limitations and do not evidence an ability to perform

fulltime work. (*Id.* at 11 (citing *Hill v. Berryhill*, No. 18-cv-15-MAR, 2019 WL 699897, at *9 (N.D. Iowa Feb. 20, 2019) for proposition that claimant need not be bedridden to collect benefits).) Finally, Claimant argues that faulting Claimant for telling a healthcare provider that he was looking forward to voting and watching election results is "literally one of the more uncivil statements an ALJ could make that warrants particular dressing down . . . ." (*Id.*)

I disagree that the ALJ "faulted" Claimant for being homeless or for being interested in politics. The ALJ merely issued a fact-based decision that happened to use facts that arose because Claimant was homeless. In context, Claimant's abilities to concentrate on reading all day, stay on the computer all day, follow election returns, watch television, and do volunteer work, all indicate a command of certain skills needed in various workplace settings. The same can be said for Claimant's household tasks. The ALJ did not err in how he evaluated these activities.

### d.    Conclusion

The ALJ's decision on this issue is supported by substantial evidence on the record as a whole. Although Claimant takes issue with the ALJ's description of his overall mental health treatment records as "mild" (AR 17), (Doc. 12 at 10), I find that, but for two months in 2018, Claimant's symptoms have largely been mild. As the ALJ noted, Claimant responded well to medications (AR at 17) and has not had any hospitalizations related to his mental health since June 2018.

Therefore, though the record contains evidence that Claimant has mental impairments that waxed and waned during the relevant time period, I find the ALJ's decision supported by the record. "[E]ven if inconsistent conclusions could be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence in the record as a whole." *Guilliams*, 393 F.3d at 801. Therefore, I **recommend** the District Court affirm the ALJ's decision on this issue.

**B.** *Whether the ALJ Failed to Provide a Sufficient Explanation for the Weight Afforded to the "Probable Other Source Opinion" From Resources for Human Development and Whether Remand was Necessary to Further Develop the Record Related to this Opinion*

On April 8, 2019,[4] someone from RHD whose signature is all but illegible, and whose name is not printed below the signature, completed a checkbox, fill-in-the-blank opinion form. (AR at 742-47.) The author said he or she saw Claimant three times or more a week for medication management and mental illness. (*Id.* at 742.) The author stated that Claimant was "dealing with high anxiety, chronic pain, feeling down, tremors, mood swings and trying to remember day to day tasks." (*Id.*) The author checked off several "signs and symptoms" that Claimant experiences from a detailed list. (*Id.* at 743.) The author checked boxes indicating that Claimant's mental abilities and aptitudes would be "limited but satisfactory" for unskilled work. (*Id.* at 744.) The author checked boxes indicating Claimant would be "seriously limited" in three of four mental abilities and aptitudes needed to do semiskilled and skilled work. (*Id.* at 745.) The author checked boxes indicating Claimant would be "seriously limited" in his abilities to interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places. (*Id.*) The author opined that Claimant would have "limited but satisfactory" ability to use public transportation. (*Id.*) The author opined that Claimant's psychiatric condition exacerbated his experience of pain. (*Id.* at 746.)

In relevant part, the ALJ found the following:

This report is not persuasive. It is not supported by or consistent with the record. It is from an unknown source and dated potentially as of a future

---

[4] The ALJ opines that the opinion could be dated April 8 or post-dated to November 8. (AR at 20.) I am choosing to give the opinion the most Claimant-friendly reading, although the copy is unclear. This reading also makes the most sense because the hearing in this matter was April 22, 2019 and Claimant's attorney told the ALJ the record was complete at that time. (*Id.* at 30.)

23

date (the date appears to be either April or November 2019). It is predominantly merely checked boxes with very little explanatory narrative and no citations to supportive laboratory findings.

(*Id.* at 20.)

### 1.  *Claimant's Arguments*

Claimant argues that the ALJ failed to provide a sufficient explanation for the weight afforded to the opinion. (Doc. 14 at 12 (citing *Fett v. Colvin*, No. C14-3034-MWB (N.D. Iowa Oct. 15, 2015) (where "the ALJ completely failed to mention, reference, or evaluate [the chiropractor's] opinion").) Claimant also asserts that the ALJ improperly found the opinion unpersuasive based on its format. (*Id.* at 15 (citing, *inter alia*, *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) for the proposition that the Eighth Circuit has never "upheld a decision to discount an MSS on the basis that the 'evaluation by box category' is deficient *ipso facto*.").)

### 2.  *Analysis*

Claimant's claim was filed on or after March 27, 2017. Therefore, the rules articulated in 20 C.F.R. Sections 404.1520c and 416.920c apply to analysis of this opinion. Under these rules, no medical opinion is automatically given controlling weight. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Opinions from medical sources are evaluated using the following factors: (1) supportability, (2) consistency, (3) provider's relationship with the claimant, (4) specialization, and (5) other factors. *Id.* §§ 404.1520c(c), 416.920c(c). Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ." *Id.*

The new rules expand the definition of "acceptable medical source" to include more healthcare providers in addition to doctors, psychologists, and qualified speech pathologists. *See* 20 C.F.R. §§ 404.1502(a), 416.902(a). Here, the ALJ is correct that the opinion does not identify the title or position of the author. Not only is there no way of knowing the author's relationship to Claimant beyond the number of weekly meetings he or she has with Claimant, there is no way of knowing the author's level of schooling, area of expertise, or level of experience in his or her field. Thus, even under the expanded rules, this was a proper reason for discounting the opinion.

### a. *Provider's Relationship with Claimant*

When evaluating a provider's relationship with the Claimant, the ALJ considers (1) the length of the treating relationship, which can "help demonstrate whether the medical source has a longitudinal understanding of [the Claimant's] impairment(s)"; (2) frequency of examinations; (3) purpose of the treating relationship; and (4) extent of the treating relationship, which includes the "kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the Claimant's] impairment(s)." *Id.* §§ 404.1520c(c)(3), 416.920c(c)(3).

Here, the ALJ only knew the frequency of the examinations and something about the purpose of the treating relationship. (AR at 742.) As stated above, the ALJ did not even know if the author was an acceptable medical source. This factor does not weigh in favor of giving the opinion more weight.

### b. *Supportability*

"The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1);

416.920c(c)(1). The ALJ is correct that the author does not explain his or her conclusions very well or cite laboratory findings or other support. (*Id.* at 20.) This was an appropriate reason to discount the opinion. *See Wildman*, 596 F.3d at 964 ("'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'") (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted)). Moreover, as discussed, the ALJ did not find this opinion unpersuasive merely because of its format, thus Claimant's argument based on *Reed* is meritless. 399 F.3d at 921. This factor does not weigh in favor of giving the opinion more weight.

### c. Consistency

"The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2).

Claimant cites no evidence to support an argument based on this factor. Thus, I find that any argument related to this factor is waived. *See Singer v. Harris*, 897 F.3d 970, 980 (8th Cir. 2018) (holding that when plaintiff did not direct the court to a place in the record where it could find alleged errors, the court would only consider the arguments that were supported by appropriate citations) (citing *Manning v. Jones*, 875 F.3d 408, 410 (8th Cir. 2017)). This factor does not weigh in favor of giving the opinion more weight.

### d. Failure to Develop the Record

Claimant asserts that because the ALJ stated it was unclear who completed the form,

> [t]he ALJ should have "more fully and fairly developed the record on those issues given the ALJ knew the provider was "Resource for Human Development"—it should have been straightforward to get that clarification

26

and such clarification should have been sought before rejecting the only treating or examining opinions provided in this case, as well as the most recent and practical opinions concerning Mr. Corwin's mental work limitations.

(Doc. 12 at 14-15.)

In his reply, filed one week after the Commissioner filed his Resistance in this matter, Claimant informs the Court that his counsel's legal assistant called RDH and learned that the author of the opinion is Jennifer Bradley, an advanced nurse practitioner with RDH. (Doc. 14 at 4.) This explanation is consistent with the signature. Claimant then states the following:

> This information in the prior paragraph is provided to show prejudice by the ALJ's failure to fully and fairly develop the record on this point—it is not intended to be record evidence related [to] a sentence six-like argument. On remand it needs to be determined when Ms. Bradley became an ARNP, if she did become an ARNP, because at that point she would have been an acceptable medical source for this claim. . . . Given Ms. Bradley's apparent qualifications, and given she stated she saw Mr. Corwin three times per week or more for "medication management and mental illness", the ALJ should have recognized that these important records were missing and obtained those records before dismissing Ms. Bradley's opinions.

(*Id.* at 4-5.) Claimant asserts that the ALJ would have an easier time obtaining relevant information from RHD than an attorney due to its subpoena power. (*Id.* at 5.)

### i. *Legal Standard*

A "social security hearing is a non-adversarial hearing, and the ALJ has a duty to fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). The ALJ bears this responsibility "independent of the claimant's burden to press [his] case" and it extends to cases where claimants are represented by counsel at the administrative hearing. *Stormo*, 377 F.3d at 806. However, the Eighth Circuit has held:

> Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

*Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). The inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.3d 1232, 1234 (8th Cir. 1993). Absent unfairness or prejudice, remand is not required. *Id.* (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir.1988)).

### ii. Analysis

Ms. Bradley wrote her opinion on April 8, 2019. (AR at 747.) Claimant's hearing was April 22, 2019. (*Id.* at 30.) The omissions that the ALJ noted are not mere technicalities. Rather, they are obvious omissions that any attorney, especially the attorney who sent the form to be completed, should have noticed when the form was returned. In this case, the form was returned in ample time for Claimant's attorney to do the research—two telephone calls—he and his staff apparently did on the day he filed the reply brief in this case. (Doc. 14 at 4-5.)[5] Furthermore, the ALJ asked counsel at

---

[5] Concerning the name and qualifications for this opinion, Mr. Field's legal assistant has called the provider and confirmed the name was Jennifer Bradley—this appears to be consistent with the signature. (*See* TR 747). Counsel (Mr. Kappelman) called the RHD Iowa Regional Director, Gina Hiler, today and she confirmed that Jennifer Bradley is a nurse practitioner and an advanced nurse practitioner1 with RHD—which is also consistent with the signature. (*See* TR 747); *see* RHD Iowa, rhd.org, https://www.rhd.org/iowa/ (last accessed on August 24, 2020). Counsel was not able to further verify this information on the Iowa Board of Nursing site,2 which appears to only allow searching of nurse discipline, or a search of license numbers when the license number is known. *See* Verify Nursing License, IBON Online Services,

28

the hearing if the record was complete and counsel answered, "Yes." (AR at 30.) It is common for ALJs to hold administrative records open for 15 or 30 days after the administrative hearing if records are outstanding, but Claimant's counsel did not request the ALJ hold the record open. The Tenth Circuit provides guidance on this issue in *Maes v. Astrue* 522 F.3d 1093 (10th Cir. 2008). *Maes* reasoned that "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant through counsel, to rest on the record indeed, to exhort the ALJ that the case is ready for decision-and later fault the ALJ for not performing a more exhaustive investigation." *Id.* at 1097; *see also Banks v. Colvin*, No. 15-CV-01040-CJW, 2017 WL 382239, at *8 (N.D. Iowa Jan. 26, 2017) ("[I]t 'would contravene the principle that the ALJ is not required to act as the claimant's advocate in order to meet his duty to develop the record . . . where, as here, neither counsel nor the claimant have obtained (or, so far as we can tell, tried to obtain) for themselves the records about which they now complain—suggesting that counsel has abandoned his role as advocate in favor of relegating that responsibility to the ALJ.'") (quoting *Maes*, 522 F.3d at 1097)), *aff'd sub nom. Banks v. Berryhill*, 713 F. App'x 528 (8th Cir. 2018).

Moreover, Ms. Bradley opined that Claimant had "limited but satisfactory skills" in all mental abilities and aptitudes needed to do unskilled work, which is in concert with the RFC. (*Compare* AR 15 *with* 744-45.) I further find that the relevant mental abilities and aptitudes in which Ms. Bradley found Claimant seriously limited were sufficiently addressed by the RFC. (*Id.* at 745.) Claimant is limited to only occasional interaction with coworkers and the general public; is limited to simple work-related decisions, problem solving, and use of independent judgment; and due to a moderate limitation in

---

https://eservices.iowa.gov/PublicPortal/Iowa/IBON/public/license_verification.j
sp (last accessed August 24, 2020).
(Doc. 14 at 4.)

his ability to maintain focus, attention, and concentration, he may be off-task up to five-percent of the workday; and he cannot perform high-stress work. (*Id.* at 15.) Moreover, although RHD helps Claimant with his housework, to the extent Ms. Bradley found Claimant's ability to maintain standards of neatness and cleanliness seriously limited (*Id.* at 745), the ALJ noted, Claimant was often appropriately groomed and dressed at medical appointments, which belies this opinion. (*Id.* at 16 (citations omitted).) Thus, Claimant was not prejudiced by the ALJ's development of the record.

### e. Recommendation

I **recommend** the District Court affirm the ALJ's decision on this issue.

## C. Whether the ALJ Properly Developed the Record Related to Claimant's Limitations

Claimant argues that the ALJ failed to develop the record related to both his mental and physical impairments. (Doc. 12 at 12-14.)

The legal standard articulated in part III.B., *supra*, applies. In addition, the ALJ must determine a claimant's RFC "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (alterations in original)).

"Because [a] claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citation omitted). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Id.* (citing *Myers*, 721 F.3d at 526-27) (affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same)). "In the absence of medical opinion evidence, 'medical records prepared by the

most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.'" *Hensley*, 829 F.3d at 932 (alteration in original) (quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)).

Although Claimant bears the burden to "provid[e] the evidence [the ALJ] will use to make a finding about [Claimant's] residual functional capacity," the ALJ is "responsible for developing the claimant's complete medical history." 20 C.F.R. § 404.1545(a)(3) (2019). "The ALJ's obligation to develop the record 'is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.'" *Coleman v. Colvin*, No. 13cv1004 EJM, 2013 WL 4069523, at *2 (N.D. Iowa Aug. 12, 2013) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)); *Martin v. Berryhill*, No. 1:18-CV-00004 JM/PSH, 2019 WL 138655, at *6 (E.D. Ark. Jan. 8, 2019) (explaining that "the ALJ must weigh the various medical opinions in the record") (citation omitted), *R. & R. adopted*, 2019 WL 334202 (E.D. Ark. Jan. 25, 2019). "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." SSR 96-4p.

## 1. *Claimant's Mental Limitations*

Dee Wright. Ph.D., reviewed Claimant's records for the state agency and determined he had only mental limitations and limited Claimant to unskilled work. (AR at 20, 69.) The ALJ did not find this persuasive in spite of the fact that Claimant only alleged mental impairments in his application, holding that "the denial of any physical

impairments is not supported by or consistent with the record as a whole." (*Id.* at 20.) On reconsideration, Jennifer Ryan, Ph.D., affirmed Dr. Wright's decision. (*Id.* at 83.) The ALJ found Dr. Ryan's opinion "somewhat persuasive, as it is mostly supported by and consistent with the record. However, additional impairments and evidence from the hearing level indicate the claimant would have additional limitations." (*Id.* at 20.)

### a. Arguments Related to Dr. Ryan's Opinion

Claimant argues that "given the significant deterioration in [his] mental functioning that occurred in 2018, and given the ALJ's rejection of the available opinions from Resource for Human Development, the ALJ should have obtained a further medical opinion concerning [his] mental opinions." (Doc. 12 at 13-14 (citing *Noerper v. Saul*, 964 F.3d 738, 747 (8th Cir. 2020).) Claimant does not take issue with the weight that the ALJ assigned to Dr. Ryan's opinion or the opinion, itself. Thus, Claimant's argument is that the record continued to grow after the state agency consultants filed their opinions.

This is not unusual. In fact, it is more common than not in Social Security cases. *See Minney v. Berryhill*, No. C16-175-LTS, 2018 WL 659860, at *8 (N.D. Iowa Feb. 1, 2018) (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.")). And, as discussed above, Claimant's most difficult months in early 2018 were not representative of his mental health during the entire relevant time period. Claimant has responded well to a combination of medications, stable housing, and other interventions that were missing from his life during that time period. Claimant wanted the Court to look at the statements Claimant made during that time in context.

32

In context, Claimant's comments in and around those two months do not require further development of the record.

Claimant cites *Noerper v. Saul*, 964 F.3d 738, 747 (8th Cir. 2020), stating that "Mr. Corwin's case on this issue is analogous to a recent published Eighth Circuit opinion, where the nonexamining agency consultant opinions just are not of much use for determining whether the claimant was disabled by the time of hearing, and consequently, a remand for further medical opinion development is required in order to allow the ALJ to fulfill the duty to fully and fairly develop the record." (Doc. 12 at 14.) However, *Noerper* can be distinguished because in *Noerper*, the "closest the record [came] to supporting" that the claimant could walk six hours a day was the report of the consulting physician who had not seen the majority of treatment records related to the claimant's knee impairment. 964 F.3d at 747. *Noerper* held that on that record, "the absence of evidence to suggest the accuracy or propriety of the 6-hour limitation [in the RFC] demonstrates that the ALJ did not fulfill the duty to fully develop the record." *Id.* Here, for the same reasons related to the ALJ's credibility determination, there was not an absence of evidence supporting the ALJ's mental RFC determination.

### b. Other Arguments

Claimant asserts that his PHQ-9 scores indicate that additional psychiatric medication management and therapy notes may be missing from the record. (*Id.* at 10 (citing AR at 528 ("pt has started seeing a new therapist at 1 tree"); 529 ("Patient reports he follows with his psych provider on 9/26/18.").) Claimant also argues that "[t]he record also generally indicated recurring insurance difficulties impacting treatment and was an issue that would be prudent to further develop in the record." (*Id.* (citing AR at 77, 706, 725).)

Claimant's PHQ-9 scores do not require further development. While the ALJ has the duty to develop the record, it is still Claimant's burden to prove he is disabled. *Cox*

*v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998). I find that expecting the ALJ to determine the record needs further development based on two stray references in separate treatment notes buried in the middle of an almost 800-page record is insufficient to alert the ALJ to the issue. Claimant apparently did not see the references prior to the hearing and develop the record himself or, worse yet, abandoned the task prior to the hearing and left it to the ALJ to find. *See Banks*, 2017 WL 382239, at *8 (counsel cannot abandon his role as advocate in favor of consigning the responsibility to the ALJ).

Moreover, further record development is not required unless the evidence is ambiguous or inadequate. *Coleman*, 2013 WL 4069523, at *2. Neither of these situations applies in this case. As discussed above, the record is not inadequate. Claimant's mental health history is well-documented in the administrative record. Moreover, the evidence is not ambiguous. No one denies that Claimant has mental health issues. However, the record is unequivocal that Claimant has responded well to medication, stable housing, and other supports and that he does well when he is compliant with his medications.

Claimant's lack of insurance also does not require remand. Although the notes state that Claimant has not had insurance at times, Claimant does not argue that he ever requested care or prescriptions and was denied due to his financial condition. *Cf Johnson v. Bowen,* 866 F.2d 274, 275 (8th Cir.1989) (although lack of funds may sometimes justify failure to seek medical care, there was no evidence plaintiff had told his physicians he could not afford the prescription at issue and was denied the medication). In fact, even when Claimant told his counselor that he did not feel ready to leave the hospital, but had to leave because of insurance limits (AR 725), there is no indication that he asked for an extended stay and was denied. Thus, Claimant has not made a cogent argument related to his lack of insurance or the need to further develop the record because of it. To the extent Claimant would like to find records stating that he sought indigent help,

lower-priced healthcare, or the like and was denied, Claimant has not made that argument and it is therefore waived. *See Aulston v. Astrue*, 277 F. App'x 663, 664-65, 2008 WL 2066019 (8th Cir. 2008) (declining to address underdeveloped argument) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases for proposition that undeveloped arguments are waived)); *Rotskoff v. Cooley*, 438 F.3d 852, 854–55 (8th Cir. 2006) (considering undeveloped argument "abandoned for failure to provide any reasons or arguments for his contentions") (quotation omitted). There is no reason to authorize a search for such records when their absence did not prejudice Claimant in any way that I can discern when, as the Commissioner points out, Claimant appears to have had almost monthly contact with healthcare providers. (Doc. 13 at 18.)

Finally, Claimant cites *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir. 2000) for the proposition that a claimant's RFC must ordinarily be supported by a treating or examining source opinion to be supported by substantial evidence. (Doc. 12 at 12.) However, *Nevland* only requires remand when the record contains no medical evidence supporting the ALJ's decision and the ALJ relies solely on the opinion of a non-treating, non-examining consulting physician to craft the RFC, which is not the situation with the case at bar. 204 F.3d at 858. Here, the ALJ found Dr. Ryan's opinion "somewhat persuasive," but the RFC included restrictions that were more limited than Dr. Ryan's in some areas. (AR at 15.) The ALJ adopted some of Dr. Ryan's limitations into the RFC. For example, Dr. Ryan found Claimant moderately limited in his ability to maintain attention and concentration for extended periods and the RFC accommodates that by stating "due to a moderate limitation in the ability to maintain focus, attention, and concentration, the claimant may be off-task for up to five percent of the workday." (AR at 15, 81.) However, the ALJ also relied on other evidence in the record to craft the rest of the RFC. *See Hensley*, 829 F.3d at 932 (in the absence of opinion evidence,

treatment notes from relevant physicians can support RFC). Thus, Dr. Ryan's opinion and all the previously discussed medical evidence support the mental RFC in this case and further development of the record is not required.

### 2. *Claimant's Tremors*

The ALJ found Claimant's tremors were a nonsevere impairment. (AR at 12.) In addition, the ALJ evaluated Claimant's tremors in the following way:

> He was provided a deep brain stimulator in January 2019 to help with his reported life-long tremors. (Exhibit 8F/14). The procedure went well, he was able to walk around and mobilize without assistance, and his hospital stay was overall unremarkable. (Exhibit 8F). He was limited to no lifting over 10 pounds or any strenuous physical activity for six weeks. (Id.). At a follow up appointment, it was noted that his tremors were improved with the stimulator and he denied any side effects. (Exhibit 8F/38). Although the claimant reported experiencing significant tremors since childhood, the record indicates there were several times when no tremors were observed or complained about. (Exhibits 6F/27, 64; 8F/41; 14F/3).[6] When he began seeking treatment specifically for the tremors, there were notations of moderate tremors in his bilateral upper extremities and mild tremors in his legs and trunk. (Exhibit 8F/2, 7; 15F/ 16, 29). One provider noted his resting tremors were worse with concentration. (Exhibit 8F/9). Another noted that at the first appointment when the claimant brought up the tremors, "patient normally sits very still but after reporting tremors he is much more active in the room and as time progresses, he is less active in the room and is sitting calmly." (Exhibit 10F/46). Finally, although the

---

[6] One of the pages the ALJ cites, 14F/3, does not say Claimant had no tremors. The page actually says that Claimant had hand tremors on August 1, 2018. (AR at 682.) However, I find this error harmless given the other citations in the string cite and the other evidence that supports the ALJ's decision on this issue. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [Claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred.") (citing *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008); *Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003)).

36

claimant reported being unable to eat, use a cell phone, or play piano due to his tremors, this is inconsistent with the record and with the claimant's other self-reported activities. (Exhibit 8F/9).

(*Id.* at 18.)

### a.   *The Parties' Arguments*

Although not dispositive, it is significant that Claimant did not list tremors, a lifelong impairment, in his application. *See Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011); *McIntire v. Colvin*, No. C14-3027-MWB, 2015 WL 3902065, at *9 (N.D. Iowa June 25, 2015).

Dr. John May reviewed Claimant's records for the state agency on reconsideration because there was no physical claim at the time of the initial claim. (AR at 77-79.) Even on reconsideration, Claimant did not assert any issues with tremors. (*Id.*) Claimant notes that Dr. May's opinion, which did not include any physical limitations, and which the ALJ therefore did not find persuasive, was "offered in October of 2017 . . . before it was contemplated that Mr. Corwin could need a deep brain stimulator implant to control his tremors." (Doc. 12 at 13.) Claimant also noted that the ALJ observed that although Claimant was sent for a consultative examination with Brian Allen, D.O., Dr. Allen did not provide any functional limitations. (*Id.* (citing AR at 20 (citing AR 341-46)).) Claimant asserts the following:

> [B]y late in 2018 that Mr. Corwin's tremors were being fully explored at the University of Iowa Hospitals and Clinics. (*See* TR 430). This led to two surgeries [to] install a deep brain stimulator in two stages. (TR 445, 439-40, 453). Given Mr. Corwin required a brain implant for his tremors and given his testimony he was having ongoing issues with his tremors, the ALJ had to obtain some additional medical evidence to evaluate Mr. Corwin's tremors.

(*Id.*)

The Commissioner responds that the record does not require additional development on this issue because Claimant's physical examinations, including

37

neurological observations, were "generally normal" with few observations of tremors. (Doc. 13 at 23 (citing AR at 18, 291 (Jan. 2017); 350 (April 2018); 525-26 (Nov. 2018—"essential tremor . . . Continue to follow up with Dr. Thomsen"); 516-18 (Jan. 2019—Pre-op visit for brain stimulator surgery).)[7] The Commissioner cites the following evidence:

> [I]n June 2017, plaintiff had intact coordination in his arms and legs and a normal gait (Tr. 336). In April 2018, N.P. Gerber observed full strength, and normal gait, coordination, and sensation (Tr. 565). N.P. Gerber did not mention any tremors. Also in April 2018, Dr. Simonenko noted plaintiff had no tremors (Tr. 374). During his late May 2018 inpatient stay, plaintiff did not display tremors (Tr. 411). In August 2018, Dr. Palma documented hand tremors, but normal gait, muscle strength, and sensation (Tr. 682). In October 2018, Dr. Greenlee observed moderate to mild tremors, but full strength in his arms and legs (Tr. 427). Plaintiff had normal coordination, gait, and finger and toe movements, though he had difficulty touching his finger to his nose (Tr. 432). On January 3, 2019, Dr. Greenlee noted resting tremors, which were worse with concentration (Tr. 434), and later that month, plaintiff was provided a deep brain stimulator for tremors (Tr. 18). After this point, to the extent that plaintiff had tremors, his records showed effective treatment (Tr. 459). In February 2019, after the insertion of the brain stimulator, Dr. Greenlee stated that plaintiff had no postural tremor in either hand (Tr. 466). The ALJ discussed all these records.

(*Id.* at 22.)

### b.    *Analysis*

Claimant cites no evidence of his "ongoing issues with tremors" even though Claimant was receiving consistent medical care throughout the relevant time period.  *See Aulston*, 277 F. App'x at 664-65; *Rotskoff*, 438 F.3d at 854–55; *see also ASARCO, LLC v. Union Pac. R.R. Co.,* 762 F.3d 744, 753 (8th Cir. 2014) ("Judges are not like pigs, hunting for truffles buried in briefs or the record.") (noting internal quotation marks

---

[7] I included the page ranges in two of the citations to give an accurate reading of the treatment notes.

omitted); *Perrigo v. Colvin*, No. 12-CV-4102-DEO, 2014 WL 1234479, at *7 n.3 (N.D. Iowa Mar. 25, 2014) (same) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

In addition to the treatment notes cited by the ALJ and the Commissioner, I add that not only did Dr. Greenlee, the neurosurgeon who implanted Claimant's brain stimulator, state in February 2019 that Claimant had no postural tremors in either hand, but also that Claimant's gait and stance were normal. (*Id.* at 466.) Claimant was released from Dr. Greenlee's care at that time to be seen only on an "as needed basis." (*Id.*) Furthermore, Dr. Gary Knudson, an orthopedist who treated Claimant in March 2019 for knee pain, specifically noted "no tremor" in Claimant's upper or lower extremities during his very comprehensive examination. (*Id.* at 633.)

Thus, the ALJ's analysis and the citations mentioned above show that the ALJ's decision is supported by substantial evidence in the record as a whole. Claimant's bare citation to Dr. May's opinion without tying it to any legal analysis leads me to conclude that he may be reading the holding of *Noerper* too broadly. Claimant may be citing *Noerper* for the proposition that any time there has been a substantial change in a claimant's medical condition after the state agency consultants write their opinions, remand is necessary. That is not the holding of *Noerper*. In fact, *Noerper* counseled against such a reading:

> At the end of the day, although most of the record can properly be characterized as mixed—which normally would require that we affirm under the substantial evidence standard—we agree with Noerper that the record is fatally lacking in one respect. There is simply no reliable evidence providing a basis for the specific conclusion that Noerper can stand or walk for 6 hours in an 8-hour workday. In reaching this result, we do not suggest that an ALJ must in all instances obtain from medical professionals a functional description that wholly connects the dots between the severity of pain and the precise limits on a claimant's functionality. Something, however, is needed. . . . Here, the closest the record comes to supporting

39

the 6-hour determination is the report of consulting physician Dr. Jung. That report, however, predated the majority of the treatment records concerning Noerper's knee conditions. We conclude that the absence of evidence to suggest the accuracy or propriety of the 6-hour limitation demonstrates that the ALJ did not fulfill the duty to fully develop the record.

964 F.3d at 746-47.

The only reason *Noerper* even mentioned the consultant's opinion was that the opinion was the closest evidence proving that the claimant could walk six hours a day. In the case at bar, there is ample evidence, including evidence from Claimant's surgeon and orthopedist, that Claimant's tremor has been managed since his stimulator implant and is nonsevere, a finding that Claimant does not challenge.

Finally, Claimant apparently mentions Dr. Allen's "non-opinion" and Dr. May's opinion as a way to indicate that an opinion is needed regarding Claimant's physical limitations. (Doc. 12 at 12-13 (citing *Nevland*, 204 F.3d at 858).) However, "medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.'" *Hensley*, 829 F.3d at 932 (alteration in original). The neurosurgeon who performed Claimant's stimulator implant is certainly a relevant treating physician. It is noteworthy that Claimant has not had any further contact with Dr. Greenlee, which indicates Claimant's satisfaction with how his implant is functioning. Moreover, as discussed above, there is ample evidence in the record supporting the ALJ's RFC limiting Claimant to light work with the additional limitations provided in the RFC. (AR at 15.)

During Claimant's counsel's opening statement at the hearing, in which Counsel listed Claimant's alleged physical impairments, the ALJ and Counsel had the following colloquy:

ALJ:        He didn't claim any physical limitations. All he claimed was depression.

ATTY:      Well, things may have changed then, I don't know, but ---

| ALJ: | Okay. So, if you have testimony with regard to physical limitations, which it sounds like your whole case is based on, then you want to make sure you have him talk about timeframes of when those things began --- |
| ATTY: | Okay, all right. |
| ALJ: | --because his entire claim is based on depression. |

(AR at 32.)

Claimant testified that his tremors only prevent him from doing "fine things" at work and that he does not work with tools, but with bigger objects such as brooms and mops. However, he does remove trash bags and do tasks such as "spraying, wiping down [things]." (*Id.* at 44, 49.) Claimant also testified in the following way when asked if he had tremors other than in his hands, "If . . . it gets really bad during panic attacks my, you know, my body shakes but not in any overly noticeable way, but I can feel it. My legs will shake and be wobbly for a little while, but generally no." (*Id.* at 45.)

Claimant's RFC limits him to frequent handling and fingering. The cleaner-housekeeper and garment sorter jobs both have level 4 finger dexterity and manual dexterity, which are rated as the "lowest" levels and limit fingering to only occasionally. Cleaner, Housekeeping, *DOT* 323.687-014, 1991 WL 672783; Garment Sorter, *DOT* 222.687-014, 1991 WL 672131.[8] Thus, to the extent Claimant still experiences hand tremors, the RFC and the jobs identified by the VE and relied upon by the ALJ accommodate them.

To the extent Claimant has panic attacks at work that cause tremors in his legs, something he did not testify occurs,[9] the RFC accommodates that by limiting Claimant

---

[8] The third job cited by the VE and relied on by the ALJ, routing clerk, has level 4 finger dexterity, level 3 manual dexterity, and requires frequent fingering. Routing Clerk, *DOT* 222.687-022, 1991 WL 672133.

[9] Claimant testified that he was "basically unsupervised" at work. (AR 46.) He stated,

to work involving only simple, unskilled work tasks with no more than occasional simple work-related decisions, problem solving, and use of independent judgment, only occasional interaction with coworkers and the public, and the ability to be off task five percent of the work day.  (AR at 15.)

### 3. *Recommendation*

Based on the preceding discussion, I **recommend** the District Court affirm the ALJ's decision on this issue.  *See Hacker*, 459 F.3d at 936 (ALJ's decision is not outside the acceptable zone of choice simply because the court might have reached a different decision).

## IV.  CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the decision of the ALJ.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the  objections.  *See* Fed. R. Civ. P. 72.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as

---

I don't have to deal with people unless I choose to, or if somebody spilled something.  And they make sure I have plenty of time to complete my tasks. . . .
If I'm, you know, really anxious I can go outside have a cigarette to try to calm me down, you know, keep – my music [on my headphones] helps.

(*Id.*)

well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** this 7th day of March, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa